The next case, United States v. Gatto. Good morning. May it please the court, my name is Michael Schachter. I represent the appellant James Gatto, as I did in the proceedings below, and I'll be arguing on behalf of all of the appellants this morning. Your Honors, in this case, the government tried to transform NCAA rule violations into a federal crime. They did so through a creative theory that what the defendants were scheming to do, they were scheming to cause students to make false representations to universities so that those students could get scholarships, and that was an intent of causing financial harm to those universities. This theory was legally and factually flawed. I would like to focus primarily this morning on four defects in the proceeding that require reversal. First, the government presented no evidence whatsoever that any of the defendants knew anything about the representations that these students would be submitting to the universities to get their scholarships, which was the actus reus of the fraud that the defendants had been accused of. Second, the district court gave a conscious avoidance instruction without the required factual predicate, and which permitted the defendant to find that the defendants had willfully caused the students to engage in a fraudulent act that the defendants did not know about. Third, the district court erred in instructing the jury, or in failing to instruct the jury, that they needed to find that the defendants had been scheming to obtain money or property, even though that is what the plain text of the Wire Fraud Statute requires. And finally, the district court excluded literally all of the evidence that the defendants sought to introduce, which would have shown that what was on the defendants' mind, their intent, was to benefit the universities and that the object of their conduct was not to cause financial harm to the universities. I'd like to begin with the government's complete failure to prove that each of these defendants knew anything about the certifications that the universities, that the students would be submitting. Isn't the deep involvement that each defendant had with this overall process as part of the world, why isn't the stepping back and looking at the evidence in totality, why isn't the inference reasonably reached that they understood that in one way or the other, each student would be making a representation of no rules violation, no eligibility disqualifying rules violations? Well, first, the government presented no evidence that individuals with similar background or experience knew anything about the certifications. Notably, the government called a cooperating witness named T.J. Gessner. Wasn't there evidence at least that the defendants knew that they had to hide rules violations from the universities? Well, there was certainly evidence that the defendants were seeking to conceal and that there would be trouble. These were violations of the rules and the defendants knew that they had to conceal the violations from the universities. True? True. Yes. And given their experience in the area, their knowledge of how things work, I mean, did they not know that the players would have to make some kind of representation to the universities that they were in compliance with the rules, whether it was a particular form or another form, but there would have to be some kind of representation. There's no evidence of that. I mean, one could speculate of that. There's no circumstantial evidence that they knew that some kind of representation would have to be made? No. And the government, what is really important, what is striking here, is that the government called a cooperating witness, T.J. Gessner, who had similar experience, background, roles as the defendants. The government had ample opportunity to ask Mr. Gessner, Mr. Gessner, did you ever discuss any of these alleged false representations, the actus reis of the fraud? Did you have any conversations about the fraud with the defendants? They chose not to. They could have asked him, Mr. Gessner, did you know, given your experience in the industry, did you know anything about any representations that student athletes make to universities to get their scholarships? They chose not to. Was there ever any evidence that any university ever extended a scholarship to anybody without asking about eligibility? Absolutely. And in fact, in Mr. Bowen's case, Tugs Bowen, the scholarship document that is submitted, the financial aid agreement that Mr. Bowen signed in order to get his scholarship, there is no dispute that it contains no false representation. We examined the compliance witness from the University of Louisville, Mr. Carnes, and the transcript site for this is 465 to 466. And he's asked about the scholarship paper, the financial aid agreement, and Mr. Carnes is asked, question, he does not represent in this document that he is eligible, does he? Not in this document, no. Question, in fact, he does not even promise that he will remain eligible. Does he make that promise? Not in this document. And the court can look at those scholarship papers. They're in the appendix. Were there any other documents pertaining to that athlete in which such a representation was made? Put aside the one that happened to be the subject of the cross of the cooperator. Was any other document as to that witness, as to that athlete submitted to the university? That athlete, at some point in the process, also signed something called a student-athlete statement, which has nothing to do with scholarships. Whether you are a student-athlete that is going to be paying his own way, or whether you're going to be on scholarship, you sign a student-athlete statement, which contains representations, which we intended to cross-examine. It's a different issue. We intended to cross-examine the compliance witness as to whether or not it's actually false or not, and we were precluded from doing so. However, there is this student-athlete statement, but it has nothing to do with the scholarship process. And more to the point, there's no evidence that any of the defendants ever saw this student-athlete statement. There's no evidence that any of the defendants had any knowledge of what a financial aid officer at a university is going to be looking at in deciding whether or not to render a scholarship. This seems, as you presented, to be a rather blatant sort of problem with the government's proof, but was this issue raised at the Rule 29 stage with the district court? It absolutely was, and throughout the trial. In fact, earlier in the case, we sought to preclude the introduction of the certifications because we said to the district court, there's no evidence that the defendants ever saw or knew anything about these certifications, so why are they even relevant evidence? We made this argument throughout the trial. We did it at Rule 29, and we submitted an outline of Rule 29. First of all, we made a general Rule 29 argument, which, according to United States v. Hoy, this court's opinion, we don't need to specify the grounds of the motions in order to preserve a sufficiency claim on appeal in any event. Although we made a general Rule 29 motion, we also specifically identified certain ways in which the government had failed to present evidence, and this was one of them. At Appendix 1192-95, we specifically argued that the government had failed to present evidence that the defendants intended to make or caused to be made false representations to the universities, and I just want to give some important background to this outline that we submitted. The district court, and this is not in the appendix, but it's transcript site 1372-73, the district court told us to submit what he called a skeleton argument in advance of our Rule 29 argument. The district court said, in Britain, they argue appeals on what is called a skeleton argument. Now, I have heard of a couple of very long ones, but that is not the intention. This is not like an appellate brief we file. We were directed to make this skeleton argument. We submitted this outline. We addressed it, and very importantly, there was no question that this was an argument that we were making throughout. The court instructed the jury, and the appendix site is page 450 of the appendix. The district court, when instructing the jury, said, the defendants in this case maintain that the government has not proved beyond a reasonable doubt that the defendants knew that the false representations that are alleged to have been made to the universities would, in fact, be made to the universities. So there is no question that we were arguing throughout. The conscience avoidance point. I mean, what about the argument that the defendants were aware that there was a high probability that some kind of documentation would be required? I mean, there were all these efforts and communications about protecting the university so the coaches in the university don't find out, and false invoices, et cetera. Wasn't there at least a high probability that they knew that there was a high probability that documentation would be required? I'd like to identify the significant distinction between concealment, which is not a crime, and the making of a false representation, which in this circumstance at least theoretically could be. The defendants' desire or awareness that people will be in big trouble if the NCAA finds out and there could be penalties that flow from that. That is not wire fraud. Concealment of a fact is not wire fraud absent a duty. They don't have the duty to disclose. That's correct, and there's no dispute about that. The government in its brief at page 30, it states that there's no dispute that the government was required to prove that the defendants knew that materially false statements would be made to the universities. I'm a little puzzled about the nature of the defense. You're stressing this point, and I understand it as an appellate point, that there is no affirmative evidence that they knew about these forms. But suppose they did. I thought part of your defense was that they believed in good faith that what the universities wanted was plausible deniability, that what the universities wanted was their athletes delivered on a silver platter, and if there was going to be any misleading done, they wanted to be told that there was no skullduggery involved, but they were, speaking of conscious avoidance, that they were the ones who were closing their eyes to evidence that these practices go on all the time. Is that part of the defense? Well, for sure, and we believe that there are many reasons why the government's evidence failed and why these defendants are innocent of these charges. That is one of them. Was there a request for an instruction that if they believed in good faith, that the universities weren't really that interested in compliance with the rules as such, but what they really wanted, they wanted to be told that there was no, they wanted not to know if there was any problem. Was that particular instruction requested? Well, I would say, well, certainly there was a good faith instruction that was requested under this court's precedent, United States v. D'Amato. And D'Amato, it's a very interesting case because it makes, it identifies for litigants and courts, what are we supposed to do when the charged victim of the fraud is an entity, but it is the entity's employee, and entities work through their employees, when the employee, in other words, the entity, is asking for the thing, then under what circumstances are you actually defrauding that entity? And we asked for an instruction that we thought was completely consistent with a very clear dictate of D'Amato, which states that a defendant is not going to be defrauding an entity under those circumstances, but when he's acting as directed, as long as he believes that his actions are in the entity's best interest, and the defendant believes that the employee is unconflicted and acting in good faith. And that is the instruction that we asked the court to provide. The court's good faith instruction and other instructions silenced the defense that we were putting on. Well, that's sort of an interesting question, though. I mean, the defendants, as is their right, did not testify, right? So none of them testified. So there's no direct evidence as to what their beliefs were. And I take it all the evidence that you contend was erroneously excluded was evidence that might have established, if believed and if appropriate inferences were drawn, that a reasonable person could well have had such a belief. Now, is that evidence? I mean, I'm analogizing in some ways like a self-defense claim. If the defendant doesn't say, I was afraid, can the defendant just rest on and introduce lots of evidence that a reasonable person would have been afraid of the alleged victim? Do you see what I'm getting at? I do. I believe that the answer to that is yes, particularly when in a fraud case, when really at the heart of the issue is what is the defendant's intent? What is the defendant's knowledge? The defendant should have pretty wide berth to present evidence that may be relevant to the jury's consideration of what is on that defendant's mind. Why are they doing what they're doing? What are they thinking about? And it doesn't require the defendant's testimony to do so. And really, I think it's akin to Your Honor's concurrence in Nakansa, where Your Honor identified the circumstance where a bank officer may ask somebody to violate the law but thinks that the transaction is in the entity's best interest. That is really effectively the kind of, in part, some of the defense that we were trying to put on. We were trying to present evidence that would tend to show to the jury that these defendants were not intending to cause financial harm through their conduct, which is an absolute requirement of wire fraud. That's just not what was on their mind. That's not what they were thinking about. What they were thinking about was the benefits that having a good five-star recruit is going to provide to the university. They're going to get there by getting the university to violate the rules. Does that make it okay? Well, okay. Their intention ultimately is that the colleges get these five-star athletes, but they're like, damn the rules. Is there not fraud involved in that? Well, I am okay in fraud. Defendants are two different things. Universities presumably would not do this in violation of the rules. They wouldn't do it if they were told that it was in violation of the rules. Whether they were really interested in knowing whether it was in violation of the rules might be a different question. I mean, there's actually plenty of evidence that would suggest that maybe a university would. Would you not argue that, or did you, that the universities knew what was going on and therefore there was no fraud at all? They knew that these certifications were false. So how could they have been defrauded? Did you make that argument? Who is the university is a really good question. Your Honor says, well, did the universities know? Or if a coach is in on it, let's say a coach is in on it and was part of the scheme or the conspiracy, does that mean the university is not? This goes to the agency question. Is the university not injured in that circumstance? Again, I submit that that is a different question than whether or not the defendant is intending to defraud or is acting in good faith pursuant to their direction of an employee, and the guidance for that is to model. You did not try the case on the theory that the coaches and the universities were in on this, correct? Well, we tried the case in part on the theory that, in fact, the coaches had directed this conduct. The evidence that Coach Bill Self of Kansas, who, by the way, remains the head coach of the University of Kansas today, which may provide some windows to how universities think about this conduct, we did present evidence that, in fact, the coach had specifically directed the payments to a player named Silvio D'Souza. We presented that evidence. That certainly was, in part, our theory, and the question became, who is the university? We presented evidence of other coaches who specifically asked for cash to be delivered to be given to the family of one of these athletes who was in question in the case. We sought to present that evidence, and we were precluded from doing so. Somewhat ironically, the cash actually wound up being used for a different athlete, but still in violation of the rules, and none of that came in. And in that recorded conversation that we were precluded from putting on, the coach says, what am I supposed to do? This is my job. What does that evidence show? I'm sorry? What would that evidence show, and why would it be offered? That evidence would have shown that the defendants were acting within the four corners of DeMotto, that they were acting in what they believed, and the only issue is what they believed for a properly instructed jury, that they were acting at the direction of a corporate agent, they were acting in a way that they believed was in the corporation's best interest, and that that employee, in doing so, was acting in an unconflicted manner. In other words, he wasn't getting a bribe or kickback to line his own pockets, such that his interests were divergent. And this is where the great ambiguity comes in as to what the universities want here. The coach wants to keep his job, and the coach knows that he's going to get fired a lot quicker for having a losing record than for having a record of tolerating violations by boosters and sponsors. And that's, I think, something that you were allowed to put an evidence on, maybe not the evidence precisely that you wanted, but there was a stipulation about how Louisville responded to the scandals around Coach Patino. Well, the stipulation was extremely bare bones, and what the jury did not hear is what was the scandal that the University of Louisville said, we're going to keep Coach Patino on. I understand that, but the point is there was evidence in the record about that, and it was possible to make precisely this argument. You did make this argument that the coaches were up to their eyeballs in this kind of behavior, right? I mean, that's what you were trying to do. That's correct, and the district court silenced that defense by giving the jury an actual authority instruction, saying that these coaches, they're not the university because the only issue is actual authority, when the issue in a fraud case has nothing to do with actual authority. I don't think the judge, where does the judge say that actual authority is the only issue? Doesn't the judge give an apparent authority instruction, which you say was complicated or convoluted? Sometimes instructions are, alas, because the judge is trying to convey complicated legal concepts, but the judge did instruct about apparent authority, right? That is correct, but first and early on in the instructions, the district court said universities, in describing what is the university, the district court said the universities only act through employees that are acting within the scope of their authority. So in other words, the district court, in a manner that in a fraud case is irrelevant, told the jury the coaches are not the university because the government also presented evidence, although none that the defendants were aware of, of the contracts between the coaches and the universities that showed that the coaches were acting outside of the scope of their authority. But in a fraud case, whether or not the coach is acting within the scope of their authority does not matter. All that matters is what's the defendant thinking? What is the defendant's intent? What do they understand? I see that I'm out of time. Just ask one, before you sit down, one question going back to the sufficiency argument, your first one. Was there any evidence in the record that the NCAA required colleges to obtain certifications of any form from athletes as to their eligibility? I think no, and certainly none that the defendants had any awareness of. And I'll just also note on this point, if I may, that the Seventh Circuit, United States v. Walters, specifically noted that lawyers specializing in sports law didn't know anything about certifications submitted by student-athletes to universities about their eligibility. And I also note the... That was a long time ago. I also note your Honor's opinion in Pauling. You have some time for rebuttal. We'll hear from the government. Good morning. May it please the Court, my name is Edward Discan, and like Mr. Schachter, I represented... I did the trial below, and I represent the government on appeal. I want to start, if I may, where Mr. Schachter started, which is the sufficiency of the evidence. And I think there are really two fundamental problems, both of which the panel picked up on or seems to in their questioning with the argument. The first is that he starts with the wrong legal standard. Mr. Schachter would have this Court adopt a completely new rule to this circuit that in a scheme to defraud case, the government is required to establish direct evidence that every member of the scheme had first-hand knowledge of the precise manner, indeed the actual paperwork on which the false statement is going to be made. There is no such requirement. As Judge Kaplan... Are you relying on evidence that some other schemer was aware that... We shouldn't be worried about Mr. Schachter's point vis-à-vis the three defendants because some other schemer knew that there was going to be this representation. Yes, Your Honor, that did in fact exist. Brian Bowen Sr., the father of Brian Bowen, who was a scheme participant, who was a member of the conspiracy, testified to having personally observed the certifications that were completed by his son and to knowing they were false at the time they were completed. More generally, what was required, though, as Judge Kaplan instructed the jury, was that the defendants knowingly participate in a scheme to deprive... How are the defendants knowingly participating in what Mr. Bowen does by way of making representations to the universities? So the whole point of the scheme, the scheme is to deprive the universities of scholarships, money or property, by false or fraudulent pretenses. That is, that the student-athletes are eligible for the financial aid they're going to get. Your question, Your Honor, is how is it the defendants could know that false or fraudulent representations are going to be made? So first and foremost, the whole point of the scheme is to get these kids, kids the defendants have rendered ineligible through their conduct, to nonetheless get the financial aid they've been rendered ineligible for. The defendants then take myriad steps to conceal their conduct, knowing that if the universities find out, the scholarships are going to be rescinded. So we identify this in our briefs. They're the bat phones, they're the indirect money... Is it clear that the universities are going to rescind the scholarships? I thought there was evidence in the record that universities, under the rules, were entitled to a defense, so to speak, against the NCAA, that, well, they didn't know about this and the students, most importantly, didn't know about it, and so maybe they should be held out briefly from competition and then receive their scholarships and be restored to eligibility after a partial season suspension. So, Your Honor, each of the three universities testified through a senior compliance representative that had they known of this particular conduct, an egregious violation of NCAA rules, their institutions would not have issued the scholarships. Would anything oblige them to ask the student whether the student was eligible? Or could the university have gone about its business and said, we'll give the scholarship unless we affirmatively stumble upon such disqualifying information? Yes, Your Honor, the testimony established is Carrie Doyle from NC State who testified about it with some specificity. The one NCAA rule is that every student athlete complete the student athlete statement. It is one of the key certifications. It is an NCAA-mandated form. Every single student athlete has to complete it. It includes a very broad statement of eligibility, and all three of the compliance officers from each of the schools testified their institution would not issue a scholarship to a student athlete who didn't certify... You know, it's kind of funny that you called the compliance officers, you didn't call the coaches, and you didn't call any university presidents who might be the people who are in a position to adjudicate any dispute between compliance officers and coaches. I mean, you know, it's sort of like calling the affirmative action officer and asking the affirmative action officer, is the university committed to affirmative action? Well, of course, it's that person's job to try to make the university comply with certain rules. That doesn't mean they do it, and that doesn't mean that the people who make the ultimate decisions are always doing what the compliance officers want done. So actually, Your Honor, respectfully, that's not quite right. The trial evidence established that when there was a conflict between the coach and the compliance department, the compliance department had the final say at two of the three schools. At the third school, it was the provost's office. But either way, the testimony established that it was not the coach's decision to make, which, by the way, was consistent with the terms of the coach's contracts, all of which are in evidence, all of which required the coaches to comply fully with the NCAA rules and to bring to the institution any knowledge they had of rules violations. And when they don't, what happens to them? Well, I'm not sure that's a relevant factor for purposes of this particular appeal, but the evidence established that they were all subject to termination. Isn't it relevant to what these people thought? If these people think we're operating in a totally corrupt and fake system where violations are blinked all the time, where we as sponsors are held accountable for trying to get people to come to the universities that we sponsor, athletes to come to the universities we sponsor, where coaches are held accountable for recruiting star athletes and then using them to win competitions and bring in customers to the university, we think that's the way the world works. And a reasonable person might think that's the way the world works, right? So I think the problem with that, Your Honor, is that is not the way these defendants thought the world works. And the way we know that is because the evidence established overwhelmingly that these defendants knew these coaches could not do that, and therefore they had to protect the coaches. And indeed, you point to a conversation in which the two of the defendants are kind of laughing about what we're doing is protecting the coach because he needs plausible deniability. Correct, Your Honor. And from that, a jury could infer that the defendants knew full well that whether it is true or not, and there is no evidence in this case to support that, but whether it is true or not that these violations happen all the time, this particular coach was not allowed to know about it, because if he knew the full details, he was going to get fired. Because no one's allowed to know about it. Because they want to be told that it didn't happen, right? I mean, isn't there a difference between a university saying, yeah, if you tell us that you bribe our athletes, of course we're not going to give them scholarships, and the university actually thinking we don't want anybody who has been bribed to attend. There's some space between those two things, isn't there? I'm not sure there is on the facts of this case. What the universities as institutions said through their compliance officers, who, as I noted, for a number of these institutions were the final arbiters, was we care deeply about the answers to these questions. And by the way, just let me pause on that point. Here's what the evidence did show. The evidence did show that when Carrie Doyle, for example, found out that one of their players might have engaged in a relatively trivial rules violation, she was so concerned about it that she went out to a site with a measuring stick to determine whether or not some arcane NCAA rules violation had occurred. She cared deeply about her job and represented the university in that position. But what matters for the purpose of this case, because of the language of the DeMotto standard, is whether or not the defendants thought that the coaches who they claim were asking them to make these payments had the apparent authority. And so when you have two defendants say, we need to give him plausible deniability, a reasonable juror could infer that, no, those defendants did not think that coach had the apparent authority. It goes beyond that, though, because sticking with Rick Pitino, in another call, a call that defendants offered, it's Defendant Exhibit 7, Defendant Dawkins says that he can't tell Pitino the details because he doesn't want to put him in jeopardy. In the two calls that Defendant Gatto places to Rick Pitino, ostensibly according to defense counsel and the defendant about these payments, there is not a single word about the payment. Both facts that the jury could use. Are you saying that even if the defendants knew that this is what the coaches wanted, they didn't have the authority, apparent or actual, to do it? That's exactly right, Your Honor. Keep in mind, de mano requires far more than simply a request from a university employee, from a coach. It requires, one, the request from the coach, two, that the coach have the apparent authority to make the request, and three, that the coach appears to be acting in good faith and unconflicted. And the way the government principally argued this case to the jury was that you can stop on prong number two. Because, yes, there is some evidence that at least one of the coaches made a request. It was more ambiguous with respect to some of the other coaches. But the evidence overwhelmingly established that the defendants did not believe these coaches had the apparent authority to make the request. They knew, in fact, they did not, which is why, you know, there's all of the secrecy around this. There's the talk about the plausible deniability. There's the talk about not putting Rick Patino in jeopardy. There is no mention whatsoever by Jim Gatto in his two calls to Rick Patino about this very subject that money is going to change hands. Because the defendants know full well that to the extent the coaches are asking for it, they cannot be doing so. And that is sufficient under D'Amato to defeat the good faith defense. I should note the defendants are not making a sufficiency argument on good faith. The fact that the defendants wanted to give the coaches plausible deniability shows that they didn't have the authority to do this. That's exactly right, Your Honor. Otherwise, it wouldn't be necessary. Can we come back just for a moment to that? I just want to round up the sufficiency issue. I think you didn't complete the thought there. You said that the NCAA has a rule that requires the university to obtain a certification from the student, not merely what three compliance officers did in practice, but that there is an across-the-board rule. A, where is that in the record? And B, what would be the basis for inferring that the defendants here would have understood that there was such a rule, such that such an affirmative representation inevitably must have been made regardless of athlete or institution? Your Honor, we can get you this, hopefully. Thank you, Mr. Chairman. Kerry Doyle, I believe this is at Special Appendix 248-249, Transcript 757-758, testified to the fact that the student-athlete statement is a required form. John Carnes at the University of Louisville offered the same testimony. Did you cite that on our brief? Correct. That's exactly right. And we offered, by the way, the same form, the student-athlete statement, completed by every single athlete in this case. Is that the statement that Mr. Schachter referred to a moment ago? It is not, Your Honor. And I was glad you asked him the question that you did, because he's referring to one of many forms that Brian Bowen filled out at the University of Louisville. Brian Bowen filled out a university-specific student-athlete sheet, which Mr. Schachter is correct on cross-examination. You know, Mr. Carnes agreed with him that the language was a little bit ambiguous. But just several days later, I think he completed the financial aid form on June 1st, and he completed the student-athlete statement on June 9th. He signed the student-athlete statement, and John Carnes testified that had he not completed the student-athlete statement, he wouldn't get the scholarship. Let's come back then to the second part of my question. Assuming, for argument's sake, that the evidence reflects that the NCAA required each institution to get an affirmative statement of eligibility by the applicant for a scholarship, what's the basis for circumstantially inferring, because there doesn't seem to be direct evidence of the point, that these defendants knew it? Is it like an SDNY attorney knowing they need to file a notice of appearance? He seemed to be saying so, but why? So, Your Honor, I think there are a couple of things. On that point in particular, the evidence established that all of the defendants were very sophisticated and very experienced actors in the space who had deep familiarity with NCAA rules. In fact, one of the defenses that was advanced at trial was that defendant Dawkins thought all of this might be okay because under an even more arcane rule than any of the rules we're talking about, he had a quote-unquote pre-existing relationship. There was very substantial evidence that the defendants understood NCAA rules, and this form was one of those rules. So from that evidence, a jury could infer that much as the defendants know about all the other rules, they know that one of the rules is that you have to make this certification. Is the rule itself in evidence? Yes, the entire rulebook is in evidence. At the transcript site you gave us? No, the entire rulebook came into evidence as government exhibits. We'll find it for you. The defendants offered it at the very end of trial. But I think there's a second issue here, which is that there was strong circumstantial evidence from which a jury could infer that the players were going to be making these certifications. Thank you. It's Government Exhibit 1503 is the rulebook. Including what you say is a rule that affirmatively requires the institution to get the student certification. Your Honor, I'm not sure that we elicited at trial the specific rule in the rulebook that required it. What we elicited was a general term, and I don't think this is disputed, that it is an NCAA rule that these forms be completed. The form itself, which is in evidence, the one for Brian Bowen, is Government Exhibit 1609, includes NCAA language. It makes clear on the face of the form it is an NCAA form. But I want to talk more holistically about what the evidence is that could lead a rational juror to infer that the defendants were aware of this. First, we have Dawkins and Code talking about the fact that Bowen needs to complete the scholarship paperwork, and they refer to one, a different, but one of the NCAA-mandated forms, an LOI or a letter of intent. That alone could lead a reasonable juror to conclude that participants in this scheme understood that paperwork, including NCAA-mandated paperwork, was going to be completed by the defendants. Surely there's a difference between knowing that paperwork is required if you're applying for a scholarship and knowing that there is a specific representation that is false that is going to have to be made in the paperwork. But I'm not sure the latter is required. What is required is that a false or fraudulent statement be made to the university. That is the representation that I am eligible. So the question for the jury is, did the government establish that the defendants understood that in order to obtain the scholarship, at some point and in some fashion, there was going to be a false representation to the university that the student-athletes were eligible? That's the question. And on that point, we've got the enormous evidence of the defendants' own efforts to conceal, which under this Court's decision in Ferguson, under this Court's decision in Cootey, is in and of itself sufficient to permit a jury to conclude that the defendants understood that false— That's their mens rea. Correct. But the actus rea is that they can't involve inaction, but it has to involve an affirmative falsehood. It still has to be required by other means. Their desire to conceal something that if discovered would be disqualifying doesn't get you there in the absence of an affirmative duty to disqualify. So in this particular respect, Your Honor, I'm not sure that that's a distinction with a difference. But let me move, because Mr. Schachter raised it and I'm sure the Court wants to discuss it, to conscious avoidance, because to the extent the defendants were actually maintaining below— and no, Your Honor, they did not make this in their Rule 29 motion. I'll come back to that in a minute. To the extent the defendants were actually making the argument below that our clients had no idea that these kids were going to be representing, that they were eligible for the financial aid they were receiving, the government was entitled to and appropriately received a conscious avoidance instruction, which is what happened in Ferguson, as Judge Engelmeyer knows better than I. In Ferguson, you had high-level employees at insurance companies who cooked up a scheme, a loss-reserve scheme, in which the transaction itself was a sham, and the result was going to be that accountants at AIG, people that did not work directly for at least some of the defendants and that some of the defendants never spoke to, were going to book the transaction in a particular way. And what this Court found was that the red flags, the indicia that the transaction was a sham, coupled with the defendants' own efforts to conceal it by doing a side letter, by demanding absolute secrecy about its terms, could both support an inference that they had actual knowledge that the actus reus, the accountants, not the defendants, were going to be making these false statements, or in the alternative, support a conscious avoidance instruction. The same thing happened in this— There's a required accounting protocol in place in Ferguson, as opposed to here, where there's no background regulator, unless you're right about what you're saying about the NCAA rule, that would require an affirmative statement like that. Your Honor, I think there is—you're exactly right. There is no distinction, because whether it was GAAP or the SEC or whatever it was in Ferguson, here it was the NCAA, which required this representation of all student-athletes in order to enroll. For God's sake, may I ask you why there wasn't, in the government's case, an explicit attempt to draw everybody's attention to what you say was a human universal here, which is a requirement across the board, institution, athlete, year, that a representation be made by the athlete to the university as to eligibility? That is putting aside the jurisdictional issue of whether that's the mailed or the wired thing. That's the actus reus in the case. So, Your Honor, that question was put to every compliance officer, and every compliance officer answered it the same way, which is that this is an NCAA-required form. Every student-athlete at every university across the country completes it. The question that was put to every cooperator, every scheme participant, is did you know this was going to be concealed from the universities? And the answer to that question was yes. That's different. It's not quite— That's not the duty. Concealed means I'm not going to volunteer that we paid you under the table. Well, but what followed it, Your Honor, could lead a reasonable juror to infer the existence of the duty, which is that had the universities known the truth, they would have rescinded the scholarship. Sure. But, I mean, had I known that a law clerk applicant has, you know, has grand theft auto, I wouldn't hire them. But if I don't ask, there's no obligation to tell. I think this is a little bit different, Your Honor. You know, certainly if the evidence established that your law clerks were all required to complete a universal form, for example, a universal financial aid form, as many colleges use, and had that, you know, student athlete or student failed to disclose that, by the way, my parents have a million dollars in the bank that I'm not telling you about, and the kid gets financial aid, is there really any serious dispute that everyone in the scheme, certainly the student and the people helping him to conceal the million dollars that his parents have, don't know he's going to be required to make the representation? Before you run out of time, how do you respond to the defendant's argument that they were acting with the best interests of the universities in mind, they were trying to help the universities land these five-star athletes? If that's true, where's the criminal intent? So the major problem with that argument, which, unlike this sufficiency point, was in fact the core of the defense at trial, is that the defendants were trying to, quote, unquote, help the universities by lying to them. And under the well-established law of this circuit, the good faith belief that everything would work out in the end is not a defense. So some of the calls for example... Isn't there a difference between a belief that everything will work out in the end and a belief that these people really don't want to know? Would it be a defense if these folks, and again, this is a question, maybe there's no real evidence of this or maybe it doesn't work out on the facts, but would it not be a defense if they believed the universities did not want to know all the details of how these athletes wound up there? So under D'Amato, the answer to that is no, unless they could establish that the person asking them to conceal this conduct had the apparent authority to do so and was acting in good faith. That may be in the specific facts of D'Amato,  that he cared more about winning than he or she cared about finding out what really went on to get the winning to happen. Why does that turn on the apparent authority of a coach? Well, in your hypothetical, Your Honor, are you suggesting that the president is the one who makes the request? Because what D'Amato requires... Let me just finish, if I may, Judge Chins, because I think it pertains to the question Your Honor is asking, which is keeping universities happy by hoping you don't get caught is not a defense to wire fraud, because that was the only way the universities were going to be happy on these facts, is if the NCAA, the universities as institutions, never found out about this conduct. Because if they did, as they did in fact in this case, then one, the student athletes were ineligible and they couldn't play, and so any benefit the university might have gotten from having this player poofed. Two, they couldn't reissue the scholarship at that point, so they couldn't replace the player with somebody else for that particular year. And three, they were subject to any number of fines and penalties, which in the prior incident involving Louisville... ...prepared to testify that at the end of the day, it's still worth it, because at the end of the day, the university has made the money. The university won that national championship, and that's what the fans care about, even if it doesn't go in the official record, it's taken out of the official record books anymore. And they got fined $500,000 for a, this is Louisville, for a major scandal involving recruiting. And their expert was prepared to say that if you were really in this for the money, you would take that fine. So I'm glad you raised the expert, because that's not in fact what the expert said. The expert did not and could not and was not qualified to say that universities regularly knowingly take this calculated risk all the time. What the expert was prepared to say... No, no, he wasn't. I didn't say that. I didn't say that the expert was going to opine about the state of mind of the university. The question is, would a reasonable person operating in this shadow world of sponsors and boosters think reasonably that what a reasonable university at the highest level cares about is fielding a winning basketball team at more or less any cost, as long as their noses aren't rubbed in it, as long as they aren't told explicitly in such a way that they have to take some action, that the players are ineligible? Your Honor, I'm trying to ground my response to Your Honor's question in the law of this circuit. And the law of this circuit, under DeMotto and its progeny, is that if someone who doesn't work for an employee is lying, is knowingly lying to that or misleading that institution, then in order to have a defense based on Your Honor's supposition here, which is that the defendant genuinely believed this is what the company wanted, this is what the university president wanted. He didn't want his nose rubbed in all the details, but he wanted the good basketball team. In order to do that, three things have to exist, which is there has to be a request from a university employee. Two, that university employee has to have the apparent authority to make that request. And three, the university employee has to be unconflicted in acting in good faith. That is what this court said in DeMotto. It is the same standard that has been used by this circuit since. And those three things didn't exist on the facts of this case, or at least a reasonably improperly charged jury didn't conclude that. And again, I note this because I think it's significant. The defendants do not raise the sufficiency challenge, as the defendant in DeMotto did, on the good faith issue. They are not challenging the sufficiency of the evidence to permit the jury to conclude that the defendants lack good faith. And they can't because the evidence is so strong that the defendants knew that these coaches did not have the authority to make this request. They didn't have the authority to bind their universities to something the universities as institutions were required under NCAA rules not to do. They didn't have the authority to subject their universities to the very substantial risks of loss. Your Honor noted the point about winning a championship. That's all well and good, but if a couple of years later the championship is rescinded, your coach is out, you're down $500,000, a university may well say, no, actually we don't want to take that risk. And, in fact, that is precisely what the compliance officer from the University of Louisville said. Thank you. Sorry. We have your argument. Thank you, Your Honors. We'll hear the rebuttal. Your Honors, I would like to respond to a few things that Mr. Diskant said. First and foremost, Mr. Diskant said that the evidence is that every single student athlete signs what's called a student athlete statement. That is incorrect. The court can scour the record. There is no student athlete. This case involves four student athletes. There is no student athlete statement signed by Mr. Preston or Silvio D'Souza. Not in the record. It's nowhere there. But that's really almost beside the point. First of all, it's not a document that is signed in connection with obtaining a scholarship, but it's beside the point because the issue is, did the defendants know about this false representation? And the government concedes they don't have any evidence that the defendants were aware of the student athlete statement, even if it did have something to do with the scholarship. There's no evidence the defendants had any awareness of it. They point to, what testimony did they say they pointed to? Well, they say the compliance witnesses knew about it. That tells you nothing about what someone who works for a shoe company is supposed to know or somebody who coaches youth basketball is supposed to know. In addition, this idea that Patriso – People's business is recruiting these athletes for – they're not shoemakers. They're not people who happen to be high school coaches or AAU coaches. They're people whose job depends on getting these athletes to the universities. So it sounds awfully naive to me to think that they don't know that the athletes at some point, or their families or somebody, is going to be asked to certify that they didn't receive the kind of payments that these folks are making and going to a lot of trouble to hide. Well, I think that it may be a fair inference that there's an awareness that this would be a violation of the NCAA rules. That is quite another thing than suggesting that there is an inference that the financial aid officer in awarding the scholarship, what particular representation is going to be made? And if I may – It's one thing to say they believed that the universities are faking it at some level, but is it really conceivable that they think that no one is actually – that the literal policy is don't ask, don't tell? That no one's going to ask whether there are payments made in violation of the rules? The answer is that there is no evidence that a person of similar experience – And what's really important is the government called a witness who had identical experience to the defendants. They could have asked Mr. Gasnola, who was a consultant for Adidas, who coached AAU basketball. Mr. Gasnola, do you know about these certifications? That still would have been insufficient. Under this court's ruling in United States v. Patriso, the government is required to prove the defendant's guilty knowledge, not that of his co-defendant. It would have been insufficient, but at least it would have been something. And the government studiously avoided – in fact, you heard from Mr. Discant. They didn't ask that question, do you know anything about the false representation? Instead, they asked about concealment. And I'll note that omissions and concealment is not even a theory that was charged to the jury and could not even be a basis for affirmance on a sufficient ground, even if it was sufficient. The difference between direct and circumstantial evidence. You're not going to be able to prove that the defendant knew it had begun to rain outside the room if the blinds were pulled, but everybody understood because people were walking in wet. This is that case, is it not, in which a background rule of eligibility, just like applying for financial aid at college, is that you're not Bill Gates, and it stands to reason there's going to be some form in which you set out the pertinent facts. There's a hyper-technical quality about the expectation you're announcing that's improbable. Two responses. First, hyper-technical. This hyper-technical distinction is the difference between lawful conduct and unlawful conduct. The existence of the false representation is either what makes these defendants simply guilty of violating the NCAA rules or guilty of a crime that carries a jail sentence. So I don't think it is hyper-technical. The false representation is critical. Second, I commend this court to Judge Chin's opinion last year in Pauling, which specifically says evidence that something is likely or even probable is insufficient for a sufficiency analysis. The government needs to present evidence from which an inference can be drawn that someone could conclude, beyond a reasonable doubt, that these defendants knew about the false representation at issue. And I'll also note, because it's not obvious, one could speculate that a student athlete may sign something saying, I didn't get any money. That's not the issue here. The issue is a certification that there are no payments that I'm not even aware of, that payments to a family member that I don't know anything about, to suggest that a student, that the defendants somehow knew that there is a particular certification to obtain a scholarship that would have covered that behavior, that is outside of what this court in Pauling said can withstand a sufficiency analysis. It's because the false representation is what makes it a crime that somebody can go to jail for. We have your argument. Thank you. Thank you. Both sides will reserve decisions.